**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LISA JOAN HALUN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 10981 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Lisa Joan Halun, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c(a)(3)(A). Ms. Halun asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

**BACKGROUND**

**A.**

**The Application Process**

Ms. Halun was born October 22, 1963 and was nearly 51 at the time of the ALJ's decision. (Administrative Record ("R.") 199). She has a high school education (R. 244) and a long work history as a waitress, since she graduated from high school. (R. 245, 340). Her most recent full-time waitressing job ended in November or December of 2012 . (R. 243, 340). The job required her to

be on her feet all day, walking for nearly the whole time, and she had to lift and carry as much as 50 pounds, and frequently carry 10 pounds. (R. 245). She claims that, due to pain in her foot, she could no longer keep up and she lost her job. (R. 41-42).

Ms. Halun alleged that she became disabled December 12, 2012, (R. 14, 199). Her application for disability benefits was denied initially and upon reconsideration (R. 11-127), and Ms. Halun requested an administrative hearing before an Administrative Law Judge ("ALJ"). (R. 136-37). At that hearing, Ms. Halun testified and was represented by counsel, and a vocational expert, Amanda Ortman, also appeared and testified. (R. 28-68). Following the hearing, on August 26, 2014, the ALJ concluded that Ms. Halun was not disabled and not entitled to disability benefits because she remained capable of performing work that existed in significant numbers in the regional economy. (R. 9-27). That decision is now before the court for review. (R. 1-5); *see* 20 C.F.R. §§404.955; 404.981; 42 U.S.C. §405(g).

## B.

## The Medical Record

The medical record in this case is sparse. Ms. Halun switched treating physicians in 2012, as her former doctor could not prescribe medication anymore. Her new doctor, Dr. Gupta, noted on April 18, 2012, that she suffered from RSD affecting her right foot. Her coordination was slow and there was swelling in her foot. She noted that, at 5'3" tall, she weighed 168 pounds. She said she had been walking a lot, working double shifts at Dave and Buster's. She filled her prescription for Norco, an opioid pain killer, and Soma, a muscle relaxant, and Ativan, an anxiety disorder medication. (R. 33).

In September of 2012, Ms. Halun saw Dr. Gupta again, with the same complaints, but added

2

that her back was hurting as well. She was still working at Dave and Buster's, but was looking for less strenuous work. At that time, she was taking Norco, Norvasc (blood pressure medication), Soma, Triamterene (diuretic), and Xanax (anxiety disorder). Muscle strength in her right foot was weak and sensation was decreased. (R. 331). She walked with a limp. Dr. Gupta added Cymbalta (anti-depressant) to her medication regimen. (R. 332).

Ms. Halun returned in December. She had been terminated from her job for "too much time off and moved away." Consequently, she had lost her insurance. Her leg pain was unchanged, and was worse with activity. (R. 328). Dr. Gupta again found weakness in her right foot. She stopped the prescription for Cymbalta and added Elavil (anti-depressant). (R. 329).

In May 2013, Ms. Halun reported that she had weakness and pain in her left leg, but that her mood was stable on medication. She wasn't engaging in any physical activity. (R. 365). Examination revealed left leg weakness and decreased sensation. Her weight was 183 pounds. (R. 366). In September, Ms. Halun reported that she had been in California in the summer and was able to exercise in a pool. She had been doing well on her pain medications. (R. 363). Sensation in arms and legs was normal, and strength was normal in her left leg. (R. 364).

In March 2014, Dr. Gupta reported that when she had seen Ms. Halun in May 2013, she was having problems with gait and balance, and her medications caused dizziness and sedation at times. Based on Ms. Halun's pain levels and medication side effect, Dr. Gupta thought she could not sit for more than 4 or 5 hours at a time, and could walk no more than 1 to 2 hours. (R. 368).

The state disability agency set up a consultative physical examination for Ms. Halun with Dr. Mutena Korman in February 2013. (R. 345). Examination revealed weakness – 3/5 – in the right leg, as well as sensory loss. (R. 347). Range of motion was limited throughout the right leg – hips,

3

knees, and ankle. (R. 348). Ms. Halun had an unsteady gait and had difficulty getting up out of a chair and getting on and off the examination table. She could not stoop or squat and could not heel/toe walk. (R. 347). Dr. Korman said he did not have sufficient medical documentation to confirm a diagnosis of RSD, and that Ms. Halun might benefit from a neurological workup. He said her symptoms may be psychosomatic and she might also benefit from psychological treatment. (R. 347).

Ms. Halun Also had a consultative psychological examination with Psychologist Victor Rini in February 2013. Dr. Rini reported that Ms. Halun was tearful and depressed. Her judgment and memory were somewhat impaired. (R. 341). He thought she was functioning at the low average range of intellectual ability, that her memory and concentration were in the low average range, and her social functioning was below average. He diagnosed chronic depression and assigned a GAF score of 59. (R. 341).

Dr. Dobson reviewed the medical evidence on behalf of the disability agency on March 27, 2013. He determined that she could lift/carry 20 pounds occasionally and 10 pounds frequently. (R. 104). She could stand or walk for just 2 hours total every day, and sit for about 6 hours. She had a number of postural limitations: she could never climb ladders, ropes, or scaffolds; she could occasionally climb ramps or stairs; she could occasionally balance, stoop, kneel, crouch, or crawl. (R. 105). She was limited to sedentary work. (R. 107).

In May 2013, Ms. Halun reported that she had weakness and pain in her left leg, but that her mood was stable on medication. She wasn't engaging in any physical activity. (R. 365). Examination revealed left leg weakness and decreased sensation. Her weight was 183 pounds. (R. 366). In September, Ms. Halun reported that she had been in California in the summer and was able

4

to exercise in a pool. She had been doing well on her pain medications. (R. 363). Sensation in arms and legs was normal, and strength was normal in her left leg. (R. 364).

In May 2013, Dr. Gupta reported that Ms. Halun suffered from pain and weakness in her lower extremities, as well as low back pain. These symptoms were often serious enough to interfere with her concentration. Side effects from her medication included dizziness and sedation. Dr. Gupta opined that Ms. Halun could sit for 4-5 hours in a workday, stand for 1-2 hours, and walk for 1-2 hours. (R. 360). The following May, May 2014, Dr. Gupta reported that when she had seen Ms. Halun in May 2013, she was having problems with gait and balance, and her medications caused dizziness and sedation at times. He explained that his estimation of her physical capacity was not based on a physical therapy evaluation, but on Ms. Halun's pain levels and medication side effects at the time. (R. 368).

## C.

## The Administrative Hearing

### 1.

At her administrative hearing, Ms. Halun testified that she had been working as a waitress her whole life, but she could no longer do it because of her reflex sympathetic dystrophy ("RSD"). It had gotten worse as the years went by. (R. 40). She explained that more recently, it had gotten worse because she fell through a deck in October 2013. (R. 41). She said she has used a cane since that incident. (R. 44). It was not prescribed, but her doctor told her she could get one from CVS or WalMart. (R. 45). Her main problem seemed to be pain her feet, which felt like they were burning. (R. 47). She had fallen down a couple of times as a result. (R. 47).

Ms. Halun said she stopped working because she could no longer carry heavy trays and walk

long distances. She lost her job because she could no longer keep up, and they got rid of her. (R. 42). Toward the end of her tenure, in 2012, her managers accommodated her by giving her lighter tasks and tasks that didn't require quite so much walking. (R. 55). She thought she could stand for about an hour before she had to sit down; she could sit for a total of two hours, but she had to get up and down. (R. 43). Her back would hurt her if she sat for too long. (R. 43). It was hard for her to get out of a chair. (R. 49). She spent most of her time watching TV and doing nothing. (R. 43).

Ms. Halun testified that she lives with her mother and stepfather. (R. 44, 50). She had been receiving unemployment insurance up until November 2013 after she lost her waitress job. (R.50). At the time she looked for part-time work – two hours a day – or jobs she could do sitting down, but couldn't find any. (R. 51). She testified that her doctor told her she could not do work that required walking or carrying heavy things. (R. 51). She was to stay off her feet as much as she could. (R. 52).

**2.**

After Ms. Halun testified, the VE, Ms. Ortman testified. She testified that, as generally performed in the regional economy, Ms. Halun's job as a waitress was considered light work. (R. 58). As Ms. Halun had been required to perform it, however, it was medium work. (R. 58).

The ALJ then gave the VE a series of hypotheticals. The first was an individual who could lift 20 pounds occasionally and 10 pounds frequently, and could stand or walk in combination for four hours a day. She could stand/walk for no more than an hour at a time, and would have to sit for 30 minutes after that. (R. 59). They could not operate foot controls more than occasionally. There were also a number of postural limitations: no climbing ladders, ropes, scaffolds; no more than occasional climbing ramps or stairs; no more than occasional balancing, stooping, kneeling, or crouching, crawling; no walking on slippery or uneven terrain; no exposure to excessive wetness,

6

workplace hazards, moving machinery, heights, flames, or large bodies of water. (R. 60). Given that laundry list of mostly obscure limitations, the VE said that such a person could not work as a waitress. (R. 60).

There were other jobs she could perform, however. The VE testified that one was office helper, which was a light job; there were 2600 office helper jobs in Illinois. (R. 61). Another job was counter clerk; there were 10,000 of those positions in Illinois. (R. 61).

The ALJ then added another limitation to his hypothetical: the individual had to use a cane any time she was on her feet for more than ten minutes. (R. 61). The VE said that such a person couldn't work as a waitress or, for that matter, as an office helper or counter clerk. (R. 62). The VE didn't think there were any light jobs such a person could perform. (R. 62). Next, the ALJ posited that the hypothetical person could only lift up to 10 pounds, stand/walk for no more than two hours a day, and had to use a cane if standing/walking more than 10 minutes. (R. 62). The VE said that such an individual could work as a credit checker; there were 2000 such jobs in the state of Illinois. (R. 62). They could also be a charge account clerk, of which there were supposedly 2400 positions in Illinois. (R. 63-63).

When Ms. Halun's attorney delved into these job examples, things became complicated. The VE agreed that there were a few categories of office helper, such as runner, data entry clerk, and messenger. (R. 63). The VE said that the job requirements for data entry clerk were no different than those of runner. (R. 63). But then the VE tried to explain further: she said the job of runner was clerical work, "not delivering pizzas or whatever . . . ." (R. 65). It was still a light duty job. (R. 65). The VE then confirmed that meant the position required up to six hours of standing and walking every day. (R. 66). The ALJ then asked her what her basis was for testifying that a person who

7

could only stand/walk up to four hours a day – as opposed to six – could do that job. The VE answered that it was her experience in job analyses and vocational counseling. (R. 67).

## II.

### THE ALJ'S DECISION

The ALJ determined that Ms. Halun did suffer from a severe impairment, reflex sympathetic dystrophy. (R. 14). He found that she had medically determinable impairments of depression and anxiety, but that they did not cause more than minimal restrictions. (R.14). She had no limitations in activities of daily living or social functioning, a minimal limitation in concentration, persistence, and pace, and had experienced no episodes of decompensation. (R. 15-16). Ms. Halun, he concluded, did not have an impairment, or combination of impairments, that met or equaled the severity of a listed impairment. (R. 16).

The ALJ determined that Ms. Halun's impairments did not prevent her from performing light work that did not require her to stand/walk for more than 4 hours a day; stand/walk more than 60 minutes at a time, to climb ladders, ropes, scaffolds; or work in concentrated exposure to wet environments or workplace hazards. The work also had to allow Ms. Halun to sit for thirty minutes after every 60 minutes of standing/walking. (R. 16). The ALJ found that Ms. Halun's allegations were not entirely credible. He noted that she received unemployment benefits, meaning that she held herself out as being able to work. He also noted that she had worked while she had reflex sympathetic dystrophy. And he stated that the fact that she drove and cared for her ex-husband's father suggested she had grater ability to function than she alleged. (R. 19). The ALJ remarked that he found Ms. Halun's presentation at the hearing to be exaggerated. She moved very slowly and used a cane as she entered the hearing room. The ALJ felt there was nothing in the medical record

that supported such severe limitations, and he added that the cane had not been prescribed. (R. 19-20).

The ALJ then considered the medical opinion evidence. He noted that, in March 2014, Ms. Halun's treating physician felt that she could not sit for more than 4-5 hours at a time or sit for more than 1-2 hours. The ALJ said he was unable to give Dr. Gupta's opinion "controlling weight" because he provided no clinical findings to support it and based it on Ms. Halun's complaints of pain. The ALJ also noted that Ms. Halun's condition improved in September 2013, and it wasn't clear that Dr. Gupta was Ms. Halun's treating physician in March 2014. (R. 21). Instead, the ALJ gave "substantial weight" to the opinion of the agency physician who reviewed Ms. Halun's medical records, Dr. Dobson. Dr. Dobson found that Ms. Halun could lift/carry 20 pounds occasionally, 10 pounds frequently, stand/walk 2 hours in a day, and sit 6 hours in a day. The ALJ said he made appropriate changes based on evidence received after Dr. Dobson's review. (R. 21).

From there, the ALJ moved on to consider the testimony of the VE. He accepted the VE's testimony that, given her residual functional capacity, Ms. Halun could not perform her past light work as a waitress. But, she could perform other light work that existed in significant numbers in the economy, such as office helper and counter clerk. The ALJ determined that the VE's testimony was consistent with the Dictionary of Occupational Titles. (R. 22). He brushed aside Ms. Halun's counsel's challenges to the VE's testimony, noting that he advances the same arguments in every case and his firm was extremely aggressive. The ALJ found the VE's testimony credible and sufficiently based on her experience. (R. 23). Based on the VE's testimony about the jobs Ms. Halun retained the capacity to perform, the ALJ concluded that she was not disabled and not entitled to DIB or SSI. (R. 23).

9

## II.

## ANALYSIS

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Far from it; over the last 12 months, the Seventh Circuit – which reviews ALJ's decisions *de novo* – has reversed half of the 26 ALJ's decisions it considered. As Judge Posner has commented, speaking about himself and his colleagues on the Seventh Circuit, "we hear a lot of appeals, and we reverse a lot." http://www.chicagolawbulletin.com/Archives/2015/03/23/ALJ-benefits-3-23-15.aspx.

An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not

address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). In this case, there are some problems with the ALJ's opinion that require this matter to be remanded to the Commissioner and, in the main, they are of the "logical bridge" variety.

**A.**

First, there are issues with the vocational expert's testimony and the ALJ's reliance on it. The ALJ determined that Ms. Halun could stand and walk for no more than a total of 4 hours each day, and for no more than 60 minutes at a time, after which she would have to sit for 30 minutes. (R. 16). Both of the jobs the VE cited – office helper and counter clerk – are categorized as light work in the DOT. http://www.occupationalinfo.org/23/239567010.html (office helper)(last visited 6/16/2016); http://www.occupationalinfo.org/24/249366010.html (counter clerk)(last visited 6/16/2016). Light work is defined as requiring the capacity to stand and walk for six hours in an eight-hour work day. 20 CFR §404.1567(b); §416.967(b); *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016); *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014). A job may also be considered light work if it requires "standing or walking, off and on, for a total of approximately six hours of an eight-hour workday" with intermittent sitting or "involves sitting most of the time with some pushing and pulling of arm or leg controls."). Without going much further, it certainly seems illogical that a person limited in the fashion the ALJ found Ms. Halun was could perform work that requires her

11

to be on her feet 6 hours each day.

The DOT's description of an office helper's duties doesn't do much to make it seem more plausible:

> Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine. May deliver items to other business establishments [DELIVERER, OUTSIDE (clerical) 230.663-010]. May specialize in delivering mail, messages, documents, and packages between departments of establishment and be designated Messenger, Office (clerical). May deliver stock certificates and bonds within and between stock brokerage offices and be designated Runner (financial).

http://www.occupationalinfo.org/23/239567010.html (Last visited 6/16/2016). The most important work activity in the job is "Performing General Physical Activities . . . that require moving one's whole body, such as in climbing, lifting, balancing, walking, stooping, where the activities often also require considerable use of the arms and legs, such as in the physical handling of materials." http://www.occupationalinfo.org/onet/57311a.html (Last visited 6/16/2016). That certainly sounds like a great deal of walking, and not much opportunity for 30 minute breaks along the way. The other position the VE cited was "counter clerk", which is described as a photo-finishing worker in the DOT, http://www.occupationalinfo.org/24/249366010.html (Last visited 6/16/2016), isn't necessarily a better option. It is also light work which, again, requires 6 hours of walking and standing. Indeed, the DOT lists standing as one of the most important elements of the job, and the most important physical element. http://www.occupationalinfo.org/onet/49017.html (Last visited 6/16/2016). Neither of these jobs sounds like an example of a light job that doesn't require to normal amount of walking or standing.

When challenged on these apparent contradictions, the VE confirmed that these positions required up to 6 hours of standing and walking each day. (R. 66). But, she said her opinion that Ms. Halun could perform these jobs despite being able to stand and walk was based on her professional experience. (R. 67). And she affirmatively stated that her testimony in no way conflicted with the DOT. (R. 67). Then, in his opinion, the ALJ stated that he "determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. 22). But, 6 hours of standing and walking is more than four hours of standing and walking, especially when those four hours can only be accomplished with 30 minute breaks every hour. By most definitions, the VE's testimony conflicts with the DOT.

An ALJ has an "affirmative responsibility" to ask whether a vocational expert's evidence "conflicts with information provided in the DOT" before relying on that evidence to support a determination of nondisability. SSR 00–4p at 4; *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008). Here, as in *Overman*, the ALJ satisfied this first step by asking the VE if her testimony was consistent with the DOT. (R. 67). And here, as in *Overman*, the VE answered wrongly that it was. (R. 67); *Overman*, 546 F.3d at 463. The ALJ couldn't just take no for an answer in a situation where the conflict was not just apparent, but laid bare during counsel's questioning. The ALJ had to obtain a reasonable explanation for the conflict from the VE. *Overman*, 546 F.3d at 463. He did not do so.

Ms. Halun's attorney, however, was not so quiescent and dug a little deeper than the ALJ. He asked the VE what the basis was for her testimony that a person who could not stand for more than 4 hours in a day could perform the light work she identified. The VE said it was based on her experience. (R. 67). Again, the situation is reminiscent of *Overman* where the court observed:

> An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for

example, the VE's experience and knowledge in a given situation exceeds that of the
DOT's authors, . . . . But here the VE said that his testimony was *consistent* with the
DOT, . . . .

546 F.3d at 464. And in *Hill v. Colvin*, 807 F.3d 862, 871 (7th Cir. 2015), the VE failed to describe the experience that allegedly formed the opinion. So did the VE in this case, right after she said her testimony was based on her experience. (R. 67). As a result, there is no explanation for the conflict; not one that satisfies the Seventh Circuit's logical bridge standard in any event.[1]

Beyond this, the numbers of jobs the VE said that Ms. Halun could perform appear far-fetched. "The inadequacy of vocational expert testimony has been remarked in a number of decisions by this and other courts, and by informed commentators." *Forsythe v. Colvin*, 813 F.3d 677, 680 (7th Cir. 2016). As the Seventh Circuit explained in *Forsyth*:

> The basic problem appears to be that the only reliable statistics concerning the number of jobs in the American economy and in regions thereof are census data of broad categories of jobs, rather than data on the number of jobs within the much narrower categories of jobs that the applicant for benefits could actually perform. Often the vocational expert simply divides the census data on the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the total number of narrow categories in the broad category, thus assuming that each narrow category has the same number of jobs—an unwarranted assumption.

813 F.3d at 681. In this case, however, the ALJ didn't even go that far.

The VE testified that there were 2600 office helper jobs in Illinois and 63,000 nationally. (R. 60, 63). When questioned by plaintiff's counsel, she confirmed that the database she used, Job Browser Pro, said that there were a total of 63,000 office helper jobs in the national economy. (R.

---

[1] Of course, as the Commissioner points out in her filing of March 29, 2016, work can be categorized as light where it either "requires walking or standing to a significant degree" or where it "requires sitting most of the time" but involve using arm or leg controls. [Dkt. #21, at 4]. But there is nothing in the DOT's descriptions of the jobs the VE cited, or in her testimony, to remotely suggest that office helpers or counter clerks are sitting and operating hand and foot controls.

14

63). These were, as the Seventh Circuit said in *Forsyth*, spread across several different categories, such as runner, data entry clerk, and messenger. (R. 63). The VE didn't divide the number by the number of categories – which would have been inaccurate enough – but, as already noted, she testified that there were that many – 63,000 – office helper jobs that Ms. Halun could perform. (R. 61). Taking the VE at her word, that would mean that not a single one of those 63,000 jobs, all of which are supposed to be light work, require the normal amount of walking and standing that light work does. That's difficult, if not impossible, to believe.[2] Accordingly, given the conflict between the DOT's description of the jobs the VE said Ms. Halun could perform and Ms. Halun's RFC, and the shaky – at best – testimony regarding the numbers of such jobs she could perform, this matter must be remanded to the Commissioner.

**B.**

The ALJ's handling of the medical opinions in this case is also cause for concern. The ALJ first considered the opinion of Ms. Halun's treating physician, Dr. Gupta. The doctor found that Ms. Halun was limited to walking for 1-2 hours a day, standing 1-2 hours a day, and sitting for 4-5 hours a day. The ALJ said that he was not able to give Dr. Gupta's opinion "controlling weight" because the doctor's opinion was based on Ms. Halun's pain and side effects from her medication. (R. 21). But the ALJ didn't indicate how much weight he *was* giving Dr. Gupta's opinion, if any.

---

[2] It's also difficult to believe that the job of "runner" had the same walking requirements as the job of "data entry clerk" – both jobs apparently fall into the "office helper" category – but that's what the VE said. (R. 64). Moreover, are there really 10,000 photo-processing counter-clerk jobs in Illinois in this age of digital photography and camera phones? The VE said that, too (R. 61), but it is noted that the DOT listing for that position was last updated 30 years ago. http://www.occupationalinfo.org/24/249366010.html(last visited 6/16/2016). *See Dimmet v. Colvin*, 816 F.3d 486, 489 (7th Cir. 2016) (commenting on the obsolescence of listing in the DOT); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)("No doubt many of the jobs have changed and some have disappeared. ").

15

An ALJ must give controlling weight to the medical opinion of a treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." 20 CFR §404.1527(c)(2); *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). But even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014). Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination," because the longer a treating physician has seen a claimant, and particularly if the treating physician has seen the claimant "long enough to have obtained a longitudinal picture" of the impairment, the more weight his opinion deserves; (2) the "[n]ature and extent of the treatment relationship"; (3) "[s]upportability," i.e., whether a physician's opinion is supported by relevant evidence, such as "medical signs and laboratory findings"; (4) consistency "with the record as a whole"; and (5) whether the treating physician was a specialist in the relevant area. 20 C.F.R. §§ 404.1527(c)(2)-(5); 416.927(c)(2)-(5) *Scrogham*, 765 F.3d at 697. Here, while the ALJ did offer two criticisms of Dr. Gupta's opinion, he didn't delve into these factors and he never got around to saying how much weight he was according it.

It's not even clear from the ALJ's opinion that he considered Dr. Gupta a treating source. One of the ALJ's criticisms of Dr. Gupta's opinion was that, when she provided her assessment of Ms. Halun's capabilities, it was "not entirely clear" that she was a treating source. (R. 21). But, Dr. Gupta completed the assessment in May 2013 (R. 360-61), he had just treated Ms. Halun on May 1st (R. 366-67), and would treat her again on September 16th. (R. 363). So, she clearly was Ms.

Halun's treating physician when she rendered her opinion. If the ALJ is referring to the letter Dr. Gupta wrote in March 2014 (R. 368), it's unclear why its date would matter as it merely confirmed the May 2103 assessment and offered a bit of an explanation. The fact of the matter is the record includes a medical opinion from a treating source. The ALJ had to evaluate Dr. Gupta's opinion bearing that in mind under 20 CFR § 404.1527(c).

The other issue the ALJ had with Dr. Gupta's opinion was that it was based on Ms. Halun's complaints of pain and medication side effects. (R. 21). It's not clear if the ALJ felt there were no side effects from the narcotic pain relievers Dr. Gupta prescribed Ms. Halun, but if he did, that would be a misstep as such medications often have serious side effects. *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). Moreover, Dr. Gupta's assessment wasn't based solely on pain and side effects. He also said it was based on Ms. Halun's problems with walking. (R. 368). And, both his letter and his notes refer to findings of weakness upon examination of Ms. Halun's leg and/or foot (R. 329, 331, 360, 368). Those findings were consistent with the results of Dr. Korman's consultative examination, which also described significant restrictions in Ms. Halun's range of motion in her right knee, hip, and ankle. (R. 347, 348). So, the limitations Dr. Gupta described were about more than subjective complaints of pain. *Cf Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016)(ALJ may properly discount medical opinion that rests entirely on the claimant's subjective complaints).

The only other medical opinion the ALJ had to consider was from the agency physician, Dr. Hobson, who reviewed the medical evidence on March 27, 2013. The ALJ indicated that he gave Dr. Hobson's opinion "substantial weight," but went no further. (R. 21). If an ALJ accords greater weight to a reviewing physician's opinion than to a treating physician's, he has to explain why. 20 CFR §§ 404.1527(e); 416.927(e); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Campbell*

*v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010). The lack of amplification from the ALJ here creates more of a puzzle than is usually the case.

The ALJ apparently didn't think much of Dr. Gupta's opinion – we don't know exactly how much – which said Ms. Halun could only walk or stand for 1-2 hours out of every work day. But, the ALJ gave substantial weight to Dr. Hobson's opinion, who indicated that Ms. Halun would be limited to sedentary work and, as Dr. Gupta had found, was limited to 1-2 hours of standing and walking each day. One supposes that an internally flawed opinion could arrive at the same conclusion as a well-crafted one but, from this, the ALJ somehow arrived at an RFC for light work indicating that Ms. Halun could stand and walk for *4 hours* out of every workday. The ALJ simply does not provide an analysis that allows one to trace the path of his reasoning, meaning the case must be remanded. *See Schmidt v. Colvin*, 545 F. App'x 552, 557 (7th Cir. 2013)(remanding where the ALJ gave great weight to the medical opinion, but provided almost no reason for doing so and included a limitation in the RFC that contradicted the medical opinion).

## C.

The plaintiff raises some additional concerns[3], but the foregoing is enough to warrant a remand. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014); *Eskew v. Astrue*, 462 F. App'x 613, 616 (7th Cir. 2011). Still, it is worthwhile to point out that, in assessing Ms. Halun's

---

[3] The plaintiff complains that the ALJ did not mention her obesity but, even in the plaintiff's opening and reply briefs, there is no explanation of how *Ms. Halun's* obesity hampers *her* ability to work. [Dkt. # 23, at 10-11; Dkt. #26, at 3]. That renders the error harmless. *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015). The plaintiff also takes issue with the ALJ's finding that, although Ms. Halun used a cane, one was not prescribed for her. That's true. But, it's not clear exactly what the plaintiff's concern is here. In *Parker v. Astrue*, 587 F.3d 920, 922 (7th Cir. 2010), the court criticized the ALJ for calling the plaintiff's use of a cane "suspicious." That's not what the ALJ did here. The point is that her doctor never mentioned her needing a cane or even recommending one in his notes.

18

mental impairment, the ALJ adopted the opinion of the agency psychologist, Dr. Kladder, who reviewed the record that Ms. Halun did not have a severe impairment: she had no limitations other than a minimal one in her ability to concentrate. (R. 15, 16, 92-93). The ALJ seemingly dismissed the opinion of the psychologist the agency had examine Ms. Halun, Dr. Rini, who found that Ms. Halun had not only low average memory and concentration, but below average social functioning and intellect. The GAF score he assigned Ms. Halun indicated she suffered from moderate symptoms, or moderate limitations.

We don't know why the ALJ selected the findings of Dr. Kladder over those of Dr. Rini – who at least examined Ms. Halun – because he doesn't say. Generally, the opinion of a source who has examined a plaintiff is afforded more weight than that of a non-examining source. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013)(". . . more weight should be given to the opinions of doctors who have (1) examined a claimant . . . ."). If an ALJ departs from that general rule, he has to explain why. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). While the Commissioner's brief offers some rationale for what the ALJ seems to have done, we review the ALJ's reasoning, not that of the Commissioner's lawyers. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014).[4]

---

[4] Even if the ALJ had explained his favoring one opinion over the other, a non-sever impairment must be considered in an RFC finding along with severe impairments. Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). So, even a minimal limitation on concentration (R. 16) would have to figure into the work Ms. Halun could do. The ALJ doesn't mention any limit on concetration in his RFC finding. (R. 16).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE: 8/30/16**